Filed 9/10/14  In re Jeremiah P. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JEREMIAH P., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G049561 |
| Plaintiff and Respondent, | (Super. Ct. No. DP022015) |
| v. | O P I N I O N |
| TERESA S., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

*        *        *

Teresa S. (mother) appeals from the juvenile court's order terminating her parental rights to Jeremiah P. (born July 2010). Mother contends the juvenile court abused its discretion by denying her modification petition (Welf. & Inst. Code, § 388; all further statutory references are to this code unless noted) without an evidentiary hearing. For the reasons explained below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

On December 11, 2011, Joshua V., the father of Jeremiah's half-siblings, called the police after mother refused to resume the care of their children after his visit with them was over. Mother complained father returned the children early, and she wanted to attend a party down the street. According to the investigating officers, mother smelled strongly of alcohol, had bloodshot, watery eyes, and slurred her speech. She admitted she suffered from depression and had taken antidepressant medication along with three or four glasses of brandy. Mother declared she did not want to take custody of the children.

The officers concluded mother was incapable of caring for Jeremiah and his older brother Noel (born January 1999)[1] and took them into protective custody.

In the detention report, a social worker noted SSA had been involved with the family on 11 occasions since 2005. A 2008 report noted mother had a history of methamphetamine and marijuana abuse and was receiving services from Latino Health Institute, including parenting, drug relapse counseling, and mental health services. She was also on antidepressant medication, and a 2009 report stated she had been in crisis for about 18 months. The report noted the fathers of her children had drug and criminal

---

[1] Noel's case is pending before this court (*In re Noel P.*, G049705).

2

histories. In 2010, mother and [Jeremiah's father] Mario [M.] [2] engaged in domestic violence. Mother continued to abuse marijuana, even while pregnant and later while breastfeeding. The family had been homeless, and mother stated she was depressed and anxious. In November 2011, mother reported she stopped taking prescribed psychotropic medication because it made her tired. During a conversation with a social worker, "mother was alternating between laughing and sobbing" and "wearing her bra on the outside of her clothing." She was taking pain killers for back pain. She stated she suffered from depression, anxiety, and admitted she was not doing a good job of medicating herself. She had numerous prescribed medications, and also a "prescription" for marijuana. Mother was referred to counseling, but she was terminated for not participating.

Joshua reported mother abused her prescription medication, marijuana, and alcohol. The children reported mother would not pick them up from school because she did not have gasoline, and she slept a lot. Mother frequently called Joshua for money, stating, "I need pot." Noel reported he provided most of the daily care for his younger siblings.

Mother claimed she was a "'victim of circumstance.'" The social worker opined mother "did not accept any responsibility for her current situation." Mother had asked father and family members for money so many times they would no longer accept her calls. She complained Medi-Cal would not pay for her antidepressant medication. She could not find a job that would accommodate her back pain disability. Mother's transient lifestyle and lack of a stable residence "was because '[n]one of [her] friends wanted" to help her. Mother denied being "'an alcoholic,'" but admitted she was a "'pothead,'" explaining marijuana "'kept [her] grounded. Without marijuana I can't do

_____

[2] The juvenile court terminated reunification services for Mario M. at the 12-month review in February 2013. Mario has not appealed from the order terminating his parental rights.

3

nothing.'"  She and Mario met as "pot users" and were just friends when she became pregnant.  She previously used methamphetamine, although she denied current use.  Mother believed she had her situation "'under control.'"  According to the social worker, mother frequently "interject[ed] unrelated statements throughout the conversation" with the social worker and "jumped from one topic to another."

SSA filed a dependency petition alleging mother failed to protect Noel and Jeremiah from a substantial risk of serious harm. (§ 300, subd. (b).)  The juvenile court detained the children and ordered SSA to provide the family with reunification services.  The court authorized funding for drug testing and ordered twice-weekly monitored visits for the parents.  The social worker referred mother to drug testing and various resources, and suggested mother seek an assessment from a mental health provider.

During her interview with the social worker before the jurisdiction hearing, mother tended to "jump around in her statements."  She presented a physician's statement recommending the use of marijuana.  Mother claimed she needed marijuana to get up in the morning because it relaxed her and "lighten[ed] [her] spirit," and if she did not "have it, it's crazy."  She admitted smoking marijuana before the interview, and explained she did not have enough money to buy marijuana as often as she liked.  She smoked it while pregnant, and later while nursing Jeremiah because they were homeless and he had a cold.  Mother also took eight prescribed medications for a herniated disk and back pain caused from a slip and fall accident in 1999, and admitted she took several of the medications on the day officers placed her children in protective custody.  She admitted she was "'unstable because [she] blew up on the cop.'"  Mother stated she had last used methamphetamine in 2009, and never participated in a substance abuse program because she "never had an abuse problem."  She revealed Mario had once "'smacked'" her in the mouth, and Noel's father, Nicholas, currently in prison, was "'very abusive'" towards her.

4

The social worker opined "the mixture of alcohol and prescription medications impaired the mother's ability to properly care for and supervise her children," and concluded mother was addicted to marijuana, but cautioned that mother failed to understand she needed substance abuse treatment.

Orangewood staff reported mother acted strangely and erratically over the Christmas holidays. She told a staffer she still loved Mario, and asked for advice. Mother complained about the boys visiting with Jeremiah's paternal aunt, Rosemary M., and made it clear she did not want the boys placed with her. The worker felt mother was jeopardizing a possible placement.

In early January 2012, mother submitted on the amended petition based on SSA's reports. The court sustained the petition, made jurisdictional and dispositional findings, and adopted the social worker's proposed case plan, including a domestic violence (PEP) program, drug testing and outpatient substance abuse treatment, a 12-step program, and general counseling. Mother was directed to undergo an evaluation concerning her prescribed medications. SSA placed the children with Albert P., their maternal uncle.

In the initial report for the July 2012 six-month status review, the social worker explained mother had been difficult to reach, and when they spoke mother had difficulty focusing and staying on track. Mother described her time spent away from the children as "'a vacation'" and expressed doubts about whether she wanted to resume caring for her children. She visited the children sporadically, and these visits were "not strong in quality." Mother had been evicted from her residence, and got into a major auto accident rendering her car inoperable. The social worker described mother's case plan participation as "minimal to none." She declined counseling, did not provide documentation showing she had completed a PEP program, stopped taking her prescribed medication, and declined to participate in drug treatment. She continued using marijuana "'as often as [she] could get it.'"

5

In late June, mother changed her mind and decided she wanted to reunify with her children. She began participating in a domestic violence program, parenting classes, and counseling, but decided not to enroll in a drug treatment program because she felt she did not have a problem. She still had a marijuana card, but claimed she recently stopped using the drug. She attended Alcoholics Anonymous (AA) meetings because she felt she did have an "'issue' with alcohol." Her visitation remained monitored at four hours per week. Albert reported the visits were "inconsistent, and poor in quality." Mother often called to cancel or reschedule and spent time during visits arguing with landlords, boyfriends, and others on her cell phone. Albert's commitment to his own children prompted him to ask SSA to move Jeremiah. In August, SSA placed Jeremiah in a concurrent foster adoptive home with the G.'s.

At the July 2012 six-month review, the court found mother's progress with the case plan was minimal, and continued the case to a 12-month permanency review hearing.

By December 2012, mother's communication with the social worker had markedly improved, but the social worker characterized her efforts and progress with the case plan as minimal and recommended termination of reunification efforts. Mother's housing situation was unstable, and she had not filled her psychiatric prescriptions, explaining she could not afford them. She had attended AA/Narcotics Anonymous (NA) meetings and completed PEP and parenting programs. She also pursued counseling services, participated in an outpatient program, and submitted to drug testing with no missed or positive tests. Despite mother's efforts, the social worker remained "very concerned as to [mother's] understanding and ability to understand the information she should have learned from her various case plan services." For example, mother admitted she relapsed on August 25 when she succumbed to peer pressure and decided to smoke marijuana with some men she met recently. Mother missed some of her monitored visits, and when visiting she continued to spend time on her cell phone rather than interact with

6

the children. She failed to bring diapers or other basic items to visits with Jeremiah. The social worker concluded mother's parenting skills had not improved, nor had she gained the insight necessary to implement the information she received while attempting to comply with the case plan.

Mother contested SSA's recommendation. In a January 28, 2013 addendum, the social worker reported mother had provided a November 2012 certificate of completion from a behavioral health outpatient program showing she had attended the required 22 group sessions and four individual sessions. She also provided proof she attended AA/NA meetings, and a letter from the county's Behavioral Health Services Agency indicating she did not meet the eligibility criteria for specialty mental health services. She was recently approved for government-subsidized housing and provided a copy of her lease. She also had completed her first college class and was awaiting approval for financial aid. She now visited the children on a regular basis. Mother explained it took her "time 'away from the kids, to grow up.'" But mother missed a drug test (considered a positive test) on January 3, and "continued to report her belief that the [dependency] case was opened [due] to no fault of her own," claiming she was "not drunk, and that her only real action was to argue with the police officer."

In early February 2013, the social worker confirmed mother had completed a 10-week parenting program, a 10-week PEP program, and 12 sessions of one-on-one counseling between May and August 2012. A counselor reported mother did well in sessions and groups, but mother was "'emotional'" and believed "she did not need to attend counseling because she was not at fault for the children's removal. " Mother terminated her counseling sessions because of scheduling issues, stating she wanted to return to school and work. The counselor opined with continued therapy or parenting services mother "'may be capable'" of caring for the children. But mother stated she was not interested in additional referrals for parenting or other programs, although she accepted a referral list for AA/NA meetings. Mother's counselor at the behavioral health

7

outpatient program stated mother "seemed to have incorporated knowledge from her participation." Both counselors "expressed hesitation" and "would not be comfortable with the mother . . . caring for children."

Both Noel and Jeremiah were doing well in their placements. Noel was "conflicted" about visiting with his mother, but was "open" to reunification with her. He enjoyed his current school and noted he was never able to stay in one school very long when he lived with mother.

At the 12-month review held February 26, 2013, mother submitted on SSA's reports and proposed orders and findings. Although it characterized mother's progress as "minimal," the juvenile court continued the case for an 18-month review. The court ordered immediate counseling for mother to address issues in the petition. The court also directed SSA to transport Noel for visits with mother at a neutral location with a neutral monitor. The court terminated reunification services for Mario. On March 26, the court granted the G.'s request for de facto parent status.

In the June 2013 report for the 18-month review, the social worker again recommended terminating mother's reunification services. The social worker noted mother had secured stable housing, and wanted to reunify with all her children. Mother was apparently not employed. She had a new boyfriend who wore a wedding band, and mother was evasive when asked whether he was married. Mother had been participating in case plan services, and recently began counseling with therapist Richard Kauffman. Kauffman reported "his clinical impression of the mother was that she suffers from borderline personality disorder," citing "mother's abuse and trauma history, her lack of acceptance of responsibility of her actions, her pattern of poor choices especially with relationships, her reactive emotionality, and other factors . . . ."

Mother complained Jeremiah called the foster mothers "mom" and "mommy," and complained about trivial matters, prompting the social worker to suggest mother should not focus on "small [] detail[s] that are not pertinent to the [overall]

8

progress of her reunification . . . ."  During a meeting in early May 2013, mother admitted she recently drank a glass of wine.  Although mother claimed she consistently attended 12-step meetings (allegedly 30 meetings in April 2013), she was unable to explain the steps beyond the first one, and was currently only working on step two despite a year of attendance. Mother admitted she did not have a sponsor.  The social worker concluded mother was "unable to actively demonstrate any of the reasonably expected amount of knowledge for her reported level of participation."

The reports from visitation monitors were not encouraging.  According to the monitors, mother's efforts at effective parenting often proved inadequate.  For example, on a late April visit mother was unable to control Jeremiah's aggressive behavior toward other children, and the staff had to intervene on several occasions. Mother failed to respond to staff directives or suggestions, and rather than focus on her children mother often used her cell phone or engaged other parents in conversation. Mother expressed a desire to improve the visits with her children, and volunteered to attend another parenting program.  Although mother previously had completed two parenting programs, the social worker agreed it would be beneficial.  Mother also asked for a parent mentor to assist her with her visitation.  The social worker gave her credit for the suggestion, but was concerned about bringing a mentor "on board at this the essentially 11th hour in an effort to provide the mother [with] parenting tips and advice on how to engage with her children . . . ."

The social worker concluded that "despite all of mother's efforts to complete her plan services, the mother has failed to demonstrate a reasonable level of understanding of the materials learned from her services."  The social worker cited mother's inability to impart an understanding of AA's 12 steps, and her use of marijuana and alcohol despite attending 12-step meetings throughout the case.  Although "both uses were reported by mother . . . , and she stated that both were one time only," the social worker believed "mother does not demonstrate an understanding of the seriousness of her

9

use of alcohol, as the potential first step into a downward slide into alcohol abuse. Instead, the mother's actions and description of the events seems to suggest the mother has minimized her alcohol use." The social worker also cited mother's history of poor choices in her relationships, and how she dealt with drugs and alcohol.

In an addendum dated July 8, the social worker reported mother's visits with Jeremiah remained at four hours per week. Jeremiah tended "to be more resistant when it is time to leave for the visit and is aggressive when he returns to the caretaker's home." The foster mother sent mother a text message to schedule a visit after Jeremiah was ill, but mother did not respond. In late May, Noel stated he wanted to soon reunify with mother, and maintain a relationship with her if he could not be reunited. He was happy and comfortable in his uncle's home.

In mid-June, mother told the social worker she felt empty without the children, explaining they kept her motivated and she requested more visiting hours in the future. The social worker advised mother he would not approve increased visiting hours because the recommendation was to terminate services. She continued to attend 12-step meetings and weekly appointments with her therapist. Kauffman, mother's therapist, reported mother was "more focused and is participating more in counseling and is motivated to being a positive influence for her children. No concerns were noted." Mother attended church regularly and had increased her support system. In mid-July, a social worker advised mother about "the miscommunication with regard to her visits," and that she continued to have four hours weekly. Mother cried and expressed frustration "as she discussed the periods of time she did not get to see her children and how she feels she was failed by SSA and her attorneys."

At the 18-month review in July 2013, the juvenile court received into evidence SSA's reports. The social worker, mother, and two of mother's therapists testified. The court terminated mother's reunification services and set a section 366.26 hearing for November 20, 2013. Mother did not petition for writ relief.

10

In the initial report for the section 366.26 hearing, the social worker recommended terminating mother's parental rights to both children. SSA deemed the boys adoptable. The children appeared comfortable and attached to the foster parents, and their caretakers expressed a desire and willingness to adopt should reunification fail.

Mother continued to visit with both boys, but the social worker described mother's visits as "poor in quality" and "near detrimental." Mother stopped visiting for approximately six weeks after back surgery, but did not provide information from her doctor indicating she was unable to participate in visits. When mother did visit, she sometimes left early because she had overlapping visits with her other nondependent children. Noel suggested terminating mother's visits early because they were of poor quality.

Jeremiah's foster parents reported that since mother started to consistently visit Jeremiah, his behavior at school and home had worsened. His aggressive behavior at school involved hitting, biting and throwing things, and usually occurred on Mondays following a visit with mother.

On the date set for the section 366.26 hearing, December 10, 2013, mother filed a modification petition as to both boys. The petition alleged mother had completed a program called "'Helping Women Succeed'" in October 2013. The program consisted of 10 workshops, and covered topics designed to enable mother to become independent and capable of caring for the children. She continued to attend self-help meetings, worked with a sponsor, and was currently working on the "fifth step." Mother sought either return of the children with family maintenance services, or additional reunification services.

The court denied the modification petition without an evidentiary hearing, finding mother did not make a prima facie showing of changed circumstances, or that modification of the prior orders was in the children's best interests. At the section 366.26 hearing, the court admitted SSA's reports and Noel and mother testified. The court

11

terminated mother's parental rights to Jeremiah, finding him likely to be adopted, and that he would not suffer detriment from the termination of mother's parental rights.

## II

### DISCUSSION

*The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Section 388 Modification Petition Without a Hearing*

Mother contends the juvenile court abused its discretion by denying her modification petition without a hearing. Section 388 provides in relevant part, "(a)(1) Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . . [ ¶ ] . . . (d) If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . , the court shall order that a hearing be held . . . ."

A modification petition "must be liberally construed in favor of its sufficiency." (Cal. Rules of Court, rule 5.570(a).) But "[t]he parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.'" (*In re Anthony W*. (2001) 87 Cal.App.4th 246, 250.) The "prima facie requirement is not met unless the facts alleged . . . would sustain a favorable decision on the petition." (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 806; *In re Alexis W*. (1999) 71 Cal.App.4th 28, 36 [party seeking modification "has the burden of showing not only that circumstances have changed, but that [proposed change] would be in the child's best interests"].) We review the juvenile court's summary denial of a modification petition for an abuse of discretion. (*In re Angel B*. (2002) 97 Cal.App.4th 454, 460.) An abuse of discretion occurs when the trial court makes an """"arbitrary, capricious, or patently absurd determination."""" (*In re Arthur C*. (1985) 176 Cal.App.3d 442, 446.) We have no basis to substitute our judgment for that of the trial court when competing inferences can

12

reasonably be deduced from the facts.  (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

Mother asserts that by the date of the 18-month review in July 2013 she had completed the activities required by the family reunification case plan.  According to her declaration, she had submitted clean drug tests, visited her sons, obtained a residence for herself and her children, and participated in the required therapy.  But the juvenile court rejected her modification petition, finding it would be detrimental because she "did not understand enough from her case plan activities to get her dependent sons back."  According to mother, the juvenile court cited the domestic violence and substance abuse that originally led to the boys' removal, and mother's history of using methamphetamine, marijuana, and alcohol.  The court was concerned mother still smoked marijuana in September 2012 and drank a glass of wine more recently in April or May 2013.  The court concluded these incidents showed mother had not implemented the lessons conveyed to her through counseling and other case plan activities.  The court also expressed concern she could not consistently recite the 12-steps discussed in support-group meetings.

Mother argues that given her case plan activities, "she did not need to do much more before her children could be safely returned to her."  She claims that in the five months after the court terminated reunification services, "she had gained the insight she previously lacked," which she demonstrated by continuing to attend a self-help meetings, and completing a 10-month empowerment workshop.  These "activities show[] she *may* have gained the insight she lacked in July 25, 2013 when the court found returning her dependent sons would be detrimental, terminated family reunification services and set a section 366.26 hearing."  She asserts, however, "[t]o sufficiently prove she has insight she must *testify* about the insight she gained since the detriment finding and termination of services.  Moreover, she must have the opportunity to *cross-examine* any assigned social worker who determined she previously lacked the insight to have her

13

sons safely returned to her. The only vehicle for such testimony is an evidentiary hearing." (Original italics.)

We disagree. While we do not doubt that mother sincerely desired to reunify with her sons, the juvenile court did not abuse its discretion in denying mother's petition without an evidentiary hearing. Ample evidence supported the juvenile court's decision. Mother's problems, which date back at least to 2005, led to an unsafe, chaotic home life for her children. The children's fathers had drug and criminal histories, and the parents engaged in domestic violence. Mother's recent marijuana and alcohol incidents fit within a pattern of self-absorption at the expense of her children. Mother failed to recognize the serious nature of the problems that resulted in dependency proceedings and initially failed to take steps to ameliorate them. Indeed, mother stated periodically during the earlier phase of the proceedings she did not want the children. She had received a multitude of services including parenting, drug relapse counseling, and mental health services, but continued to self-medicate, and did not take her prescribed medications. As a social worker wrote in 2009, mother was always "in crisis . . . ." When the children were in her care, the family often led a transient existence. Mother appeared unable to understand and apply information she should have learned from her various case plan services.

The fact mother attended another empowerment program did not demonstrate she had gained the insight that years of similar programs and services had not instilled. The "Helping Women Succeed" program appeared geared toward employment issues, rather than the issues (substance abuse, domestic violence, and neglect) that brought Jeremiah before the court. Headings for workshops included "How to build up personal strengths;" "How to prepare a good resume;" "How to heighten my self-esteem;" "How to maintain job security;" "How to handle job interviews;" "How to understand personal boundaries and self-respect;" "How to deal with conflict management and helpful resolutions;" and "How to build confidence and climb up

14

corporate ladder," "How to turn your positive aspects to feel good and confident." Finding and maintaining employment was a case plan component, but it was not the primary barrier to reunification.

Mother argues her petition established a prima facie case for a hearing and an opportunity to testify that she had the requisite insight into her problems. Mother's petition, however, failed to show she had the ability to act on any insight she may have acquired in following her case plan and given mother's long history of drug and alcohol abuse and associated problems, the barrier to reunification was high. At the time the juvenile court terminated services, mother had yet to progress beyond monitored visitation, and the quality of her visits were poor. She neglected her children's needs during visits as she pursued her own interests, talking to other parents or using her cell phone. While supposedly attending 12-step meetings almost daily, mother was "unable to actively demonstrate any of the reasonably expected amount of knowledge for her reported level of participation." At the time she filed the modification petition, she had not progressed through the 12 steps toward sobriety. Mother effectively disappeared for six weeks during the post-reunification period, and only resumed visits at the social worker's suggestion.

Nothing mother presented in her section 388 modification petition demonstrated she had overcome the fundamental issues that prevented her from safely parenting Jeremiah. She did not provide, for example, declarations from her counselors, therapists, or anyone in her new "support system" asserting they believed she could safely parent her children. Nor did her AA sponsor offer any evidence concerning her progress. Her counselors previously suggested she *might* be able to safely parent with ongoing counseling, but she opted not to continue her sessions because other needs prevailed. Mother never accepted responsibility for the original incident leading to dependency. Indeed, she consistently denied any wrongdoing that caused the children's

15

removal from her care, and nothing in her modification petition suggests mother fundamentally accepted responsibility for her plight.

Mother's petition showed some signs of progress, displaying a belated commitment to reunification. But her petition did not demonstrate a change in circumstances that would lead the court to conclude a modification of its previous orders would promote Jeremiah's best interests. By the time mother filed her petition, Jeremiah had been in a safe, stable, and loving placement for 16 months with foster parents who wanted to adopt him. Removed at the age of 15 months, there was no indication he viewed his mother in a parental role, and referred to his foster parents as "mom" and "mommy." The court reasonably could conclude Jeremiah's best interests would not be promoted by living with mother.

Mother's reliance on in *In re Daijah T.* (2000) 83 Cal.App.4th 666 (*Daijah T.*) is misplaced. There, the mother, who had reunited with three of her five children, declared in her modification petition her children were bonded with each other (*id*. at p. 669), and her petition "alleged some evidence that the best interests of the [two] minors would be promoted by their reunification with their siblings [who lived with the mother]." (*Id*. at p. 675.) *Daijah T.*, however, does not hold the court must grant a modification petition if the parent demonstrates a positive change. As noted above, to establish a prima facie showing, the parent must present "facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) Mother's modification petition, at best, showed only changing circumstances within the context of her history of drug and alcohol abuse and self-absorption to the detriment of her children. Under these circumstances, we cannot say the trial court abused its discretion in denying mother's request for a hearing on her modification petition.

16

## III

### DISPOSITION

The judgment terminating parental rights is affirmed.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.